**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| WES JOHNSON, | ) | 3:05-CV-0321-RAM |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM  DECISION** |
| | ) | **AND ORDER** |
| vs. | ) | |
| | ) | |
| WELLS FARGO HOME MORTGAGE, | ) | |
| INC., a California Corporation, dba | ) | |
| AMERICA'S SERVICING COMPANY, | ) | |
| et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the court is Defendant Wells Fargo Bank, N.A.'s Motion for Summary Judgment (Doc. #105).  Plaintiff responded to the motion (Doc. #112) and Defendant replied (Doc. #119).

## I. BACKGROUND

### A.    Factual Background

Defendant Wells Fargo Home Mortgage, Inc. dba America's Servicing Company (ASC) purchased and serviced ten (10) of Plaintiff Wes Johnson's real property mortgage loans. This action arises out of two (2) of those loans, Loans 55 and 56 (Doc. #112 at 2).  Plaintiff alleges Defendant erroneously reported Loans 55 and 56 delinquent to the three (3) major credit reporting agencies (CRAs) (*Id*.).  Plaintiff further alleges Defendant foreclosed on Loan 56 and continued to erroneously report both loans delinquent despite Plaintiff's numerous attempts to correct the erroneous information (*Id*.).  Plaintiff asserts he suffered millions of

1  dollars in actual damages due to Defendant's erroneous reporting, which Plaintiff contends

2  was a willful violation of the Fair Credit Reporting Act (FCRA).

3      Construing the facts in the light most favorable to Plaintiff, it appears Plaintiff notified

4  the CRAs that he disputed Defendant's reporting of the two (2) loans.  Plaintiff also spent

5  approximately nine (9) months making multiple phone calls and sending correspondence,

6  cancelled checks and loan documents to Defendant in an unsuccessful attempt to verify that

7  both loans were current (Doc. #112 at 2).  Apparently, Plaintiff wrote a check to make a

8  payment on Loan 56; but, Defendant misapplied the check to Loan 55 causing Loan 56 to

9  become delinquent (*Id.*).  Although Defendant acknowledged the check was, in fact,

10  misapplied to the wrong account, rather than correct the error, Defendant informed Plaintiff

11  it would not reverse the check and apply it to Loan 56 because it mistakenly believed Loan

12  55 was also delinquent (*Id.*).  Eventually, Defendant foreclosed on Loan 56 and continued to

13  erroneously report both Loans 55 and 56 delinquent to the CRAs (*Id.*).

14      Plaintiff alleges Defendant's willful conduct of refusing to correct its error and

15  continuously reporting both Loans 55 and 56 delinquent to the CRAs caused him to suffer

16  well over thirty (30) million dollars in actual damages (Doc. #105 at 5-6).  Plaintiff claims

17  he suffered damages by being precluded from acquiring mortgage loans and refinancing

18  existing loans and being forced to pay higher interest rates on various mortgages and lines

19  of credit (Doc. #112 at 2).  Plaintiff also claims he suffered damages when his existing lines

20  of credit and credit cards were reduced and/or cancelled (*Id.*).  To name just a few, Plaintiff

21  alleges he suffered the following actual damages: more than six (6) million dollars in lost

22  business opportunities by being unable to develop certain properties; more than eleven (11)

23  million dollars in anticipated profits by being forced to sell properties early; more than nine

24  (9) millions dollars in lost business opportunities on approximately fifty (50) real estate

25  transactions he was unable to purchase; and approximately $25,000 in lost profits by being

26  forced to sell stock prematurely (*Id.*).  Plaintiff also seeks punitive damages asserting

27

28

1   Defendant's refusal to reinvestigate Plaintiff's dispute and failure correct its error was a

2   willful violation of the FCRA (Doc. #112 at 7).

3   **B.   <u>Procedural Background</u>**

4   On June 20, 2007, Plaintiff filed an Amended Verified Complaint, which included the

5   following causes of action: 1) violations of the Real Estate Settlement Procedures Act (12

6   U.S.C. § 2605) (RESPA); 2) violations of the Fair Credit Reporting Act (15 U.S.C. § 1681s-2)

7   (FCRA); 3) violations of the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et. seq.)

8   (FDCPA); and, 4) negligence (Doc. #66).  On August 16, 2007, Defendant filed a motion for

9   summary judgment on each of Plaintiff's causes of action (Doc. #70).  On October 29, 2007,

10  the court granted Defendant's motion for summary judgment on Plaintiff's First, Third and

11  Fourth causes of action and denied Defendant's motion as to Plaintiff's Second cause of action

12  for violations of the FCRA (*Id.*).  The court determined there were genuine issues of material

13  fact precluding summary judgment with regards to some of Plaintiff's alleged damages under

14  the FCRA (Doc. #94).  Specifically, the court found there were genuine issues of material fact

15  as to 1) whether Defendant was properly notified of the disputed information and 2) whether

16  the credit reports obtained in the various transactions giving rise to Plaintiff's alleged

17  damages were obtained for "consumer purposes" and not for "business purposes" such that

18  the various transactions would be subject to the requirements and protections of the FCRA

19  (*Id.*).  Based on the court's ruling, Defendant filed the instant motion for summary judgment

20  asserting Plaintiff's alleged damages are not recoverable under the FCRA (Doc. #105).

21  **II.  STANDARD FOR SUMMARY JUDGMENT**

22  The purpose of summary judgment is to avoid unnecessary trials when there is no

23  dispute as to the facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

24  18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment where,

25  viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there

26  are no genuine issues of material fact in dispute and the moving party is entitled to judgment

27  as a matter of law. FED. R. CIV. P. 56(c); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

28

Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. FED. R. CIV. P. 50(a).  Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials of the pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. FED. R. CIV. P. 56(c); *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson*, 477 U.S. at 248.  As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.*  Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.*

///

///

**III. DISCUSSION**

Defendant moves for summary judgment on Plaintiff's FCRA claim asserting Plaintiff's alleged damages resulted from the use of credit reports, if any, in connection with his business or commercial transactions, which are not consumer reports subject to the FCRA (Doc. #105 at 18). Defendant further asserts that it cannot be held liable for Plaintiff's business losses predating Defendant's alleged failure to reinvestigate; Plaintiff's damage theory based on anticipated profits is barred as a matter of law; Plaintiff cannot claim damages for lost real estate opportunities under the FCRA; and Plaintiff is not entitled to punitive damages because he failed to sufficiently plead a willful failure to investigate on the part of Defendant (*Id.* at 24-30).

Plaintiff argues his damages arise from the inaccurate information reported by Defendant and not from the use of any credit reports (Doc. #112 at 3-5). Plaintiff further argues that Defendant is liable for any actual damages arising from its failure to comply with the FCRA; his anticipated profits are not barred as a matter of law; the FCRA does not bar recovery of damages for lost real estate opportunities; and he is entitled to punitive damages because Defendant's violation was willful (*Id.* at 5-7).

In its October 29, 2007 Order, the court found Plaintiff's commercial loans and business lines of credit did not fall under the coverage of the FCRA (Doc. #94). The court made this determination due to Plaintiff's failure to dispute the alleged transactions were purely commercial and/or business in nature and Plaintiff's failure to show that, despite the transactions being commercial and/or business in nature, a consumer report was involved in the transactions, thereby, bringing them within the scope of the FCRA. The court specifically stated "[u]*nder these facts,* the credit reports obtained for Plaintiff's commercial loans do not fall under the FCRA [as Plaintiff did not allege a consumer report was involved in any of the transactions]; however, the credit reports obtained in connection with Plaintiff's credit lines (provided they are personal lines of credit and not business lines of credit) and personal financing are 'consumer reports' falling within the coverage of the FCRA." (*Id.* at 12-

13 (emphasis added)).  The court also found material questions of fact existed as to whether any of Plaintiff's other alleged damages involved the use of a consumer report bringing those transactions under the coverage of the FCRA (Doc. #94 at 13).

Based on the court's finding that Plaintiff's business and commercial transactions are not subject to the FCRA, Defendant brought the instant motion asserting any reports used in connection with Plaintiff's alleged damages were not "consumer reports" because they were all in connection with business or commercial transactions.  Plaintiff does not dispute Defendant's assertion that no consumer reports were involved in the various transactions; but, rather he argues that his business damages are, nevertheless, recoverable under the FCRA simply because Defendant failed to comply with the requirements set forth under the FCRA (Doc. #112 at 3).

Plaintiff appears not only to misconstrue the court's previous order expressly finding his business and commercial transactions are not subject to the FCRA, but also to misunderstand the causal connection required to link his alleged actual damages to Defendant's violation.  Thus, due to the apparent misconception and the developing caselaw in this area, the court will address each damage claim in Defendant's motion, including Plaintiff's business and commercial transactions, to determine if a consumer report was obtained bringing the transaction under the coverage of the FCRA.  The court will then address Defendant's remaining arguments.

### BRIEF OVERVIEW OF THE FCRA AND FURNISHER'S OF INFORMATION

The Fair Credit Reporting Act (FCRA) was enacted in 1970, prefaced with a congressional finding that "unfair credit methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1); *Nelson v. Chase Manhattan Mortgage Corp*., 282 F.3d 1057, 1058-1059 (9th Cir. 2002). The FCRA provides for civil and criminal penalties for those who do not comply with its requirements. 15 U.S.C. § 1681n; 15 U.S.C. § 16810; *see also, Comeaux v. Brown v. Williamson Tobacco Co*.,

6

915 F.2d 1264, 1272 (9th Cir. 1990).  Sections 1681n[1] and 1681o[2], respectively, make CRAs and users of information liable for willful or negligent noncompliance with "any requirement imposed" under the FCRA.  *Comeaux*, 915 F.2d at 1272.   While §§ 1681n and 1681o undoubtedly create private rights of action for consumers, § 1681s-2(b), dealing with furnishers of information, does not expressly create a private right of action.  The Ninth Circuit, however, holds an individual consumer does have a private right of action against a furnisher of information under § 1681s-2(b). *Nelson*, 282 F.3d at 1057.

A furnisher of information can be held liable for failing to comply with the requirements set forth in Section 1681s-2(b), which include the following upon proper notice of a dispute: 1) conduct an investigation with respect to the disputed information; 2) review all relevant information provided by the CRA pursuant to § 1681i(a)(2); 3) report the results of the investigation to the CRA; and 4) if the investigation finds the information is incomplete or inaccurate, report those results to all CRAs to which the person (furnisher) furnished the information and that compile and maintain files on consumers on a nationwide basis. *Nelson*, 282 F.3d at 1059.

Liability on a furnisher is limited in that an individual consumer cannot state an FCRA claim against a furnisher unless the furnisher receives notice of the disputed information *from the CRA* and fails to comply with its duties. *Id.* at 1060 ("Congress did provide a filtering mechanism in § 1681s-2(b) by making the disputatious consumer notify a CRA and setting up the CRA to receive notice of the investigation by the furnisher."); *see also Marshall v. Gravitt*, 2007 WL 1792416, 3, ---- F. Supp. 2d ---- (D. Nev. 2007) (official citation not

---

[1] Section 1681n provides: "Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 or more than $1000 ... [and] such punitive damages as the court may allow; and ... costs of the action together with reasonable attorney's fees ..."

[2] Section 1681o provides: "Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of any actual damages sustained by the consumer as a result of the failure; and ... costs of the action together with reasonable attorney's fees ..."

available); *Abouelhassan v. Chase Bank*, 2007 WL 3010421, ---- F. Supp. 2d ---- (N.D. Cal. 2007) (official citation not available); *Nelson v. Equifax Information Services, LLC*, 522 F. Supp. 2d 1222, 1231 (C.D. Cal. 2007) (interpreting *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d at 1060 as "specifically [holding] that the furnisher's Section 1681s-2(b) duty to investigate is triggered only after the consumer notifies the CRA, and the CRA then notifies the furnisher of credit."). Thus, a furnisher's duty to investigate does not arise unless it receives notice of the dispute from the CRAs directly. The Ninth Circuit interpreted this "filtering mechanism" as an "opportunity for the furnisher to save itself from liability by taking the steps required in § 1681s-2(b)." *Nelson*, 282 F.3d at 1060. Failure to take the required steps can result in liability.

### LIABILITY OF FURNISHERS OF INFORMATION UNDER §1681s-2(B) AND PROVING DAMAGES

Plaintiff alleges Defendant willfully and/or negligently violated §1681s-2(b) of the FCRA by failing to conduct a reasonable investigation of the debts Defendant reported to the CRAs after being notified by the CRAs and by Plaintiff that the debts were in dispute (Doc. #66, Doc. #112 at 4). Based on Defendant's alleged willful violation, Plaintiff claims he is entitled to his actual damages, punitive damages and reasonable costs and attorney's fees (Doc. #66). However, in order to prove actual damages, Plaintiff must do more than show a failure to comply with the FCRA; Plaintiff must also show he suffered the alleged actual damages *because of* Defendant's violation. To clarify, the court will demonstrate the required elements Plaintiff must show in order to prove his alleged damages.

### A.   **Failure to comply with the FCRA**

The first element in stating an FCRA claim against Defendant requires Plaintiff to show that Defendant failed to comply with the FCRA. As previously stated, Defendant can be held liable for failing to conduct an investigation with respect to the disputed information; failing to review all the relevant information provided by the CRA pursuant to §1681i(a)(2); failing to report the results of the investigation to the CRA; and, if Defendant's investigation

found the information incomplete or inaccurate, failing to report those results to all the CRAs to which Defendant furnished the disputed information and those that compile and maintain files on consumers on a nationwide basis. *Nelson*, 282 F.3d at 1059.

As previously discussed, there are genuine issues of material fact as to whether and when a CRA notified Defendant of the disputed information.  This is important because Defendant's duties under the FCRA are not triggered until it is notified by a CRA directly. *Nelson*, 282 F.3d at 1060.  Defendant disputes being properly notified; however, there is no dispute that Plaintiff completed a Credit Report Dispute Form on December 14, 2004 indicating he disputed Defendant's reporting (Doc. #105 at 26).  Defendant has not argued for summary judgment on the basis that it did, in fact, take reasonable steps to investigate or reinvestigate the disputed information; rather, Defendant moves for summary judgment solely on the basis that Plaintiff's alleged damages are not recoverable under the FCRA and Plaintiff has failed to sufficiently plead a willful violation.

Viewing the facts and the evidence in the light most favorable to Plaintiff, he has shown Defendant failed to comply with the requirements set forth in the FCRA; thus, he has met the first element.

**B.**   **Actual Damages and the Use of a Consumer Report**

The next element in stating an FCRA claim against Defendant requires Plaintiff to show that he is entitled to damages under the FCRA.  The FCRA provides for three types of damages depending upon whether the violation was willful or negligent – actual, statutory and punitive. If Plaintiff proves a willful violation, he will be entitled to either actual damages or statutory damages and he may be entitled to punitive damages at the court's discretion. 15 U.S.C. § 1681n.[3]  If Plaintiff proves a negligent violation, he will only be entitled to actual

---

[3] 15 U.S.C. § 1681n provides, in pertinent part:

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of--
(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; ...
....

damages. 15 U.S.C. § 1681o.[4]  Because Plaintiff alleges both a willful and a negligent violation of the FCRA, his next step is to show he suffered actual damages because of Defendant's violation.

Defendant asserts Plaintiff cannot establish actual damages under the FCRA because the alleged damages at issue are for business and/or commercial transactions not subject to the FCRA and Plaintiff is not entitled to anticipated profits or lost real estate opportunities (Doc. #105).  To support its assertion, Defendant contends that no consumer reports were involved in any of the various transactions giving rise to Plaintiff's alleged actual damages (*Id.*).

Plaintiff argues §§ 1681n and 1681o provide for any actual damages sustained by a consumer as a result of the willful or negligent failure to comply with the FCRA (Doc. #112 at 5).  Plaintiff further argues that Defendant mistakenly framed the issue making "much ado about nothing in regards to the FCRA's definition of a 'consumer report'..." because he is not basing his damages on the use of a credit report (*Id.* at 3-4).  Plaintiff does briefly state that § 1681(a)(3)(F) identifies a business transaction initiated by a consumer as a permissible purpose under the definition of a consumer report; however, Plaintiff does not dispute the transactions at issue were solely business and/or commercial in nature.

Plaintiff's argument that the use of a consumer report and the definition of a consumer report are irrelevant to his claim for actual damages fails as a matter of law.  Plaintiff claims damages resulting from various business and/or commercial transactions, including denials

---

(2) such amount of punitive damages as the court may allow; and
(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

[4]15 U.S.C. § 1681o provides, in pertinent part:

Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of --
(1) any actual damages sustained by the consumer as a result of the failure; and
(2) in the case of any successful action to enforce liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

of credit and increased interest rates and fees.  As set forth in detail *infra,* it is generally held that losses resulting from the use of a credit report solely for a business or commercial transaction are not recoverable under the FCRA.  Yet, in an attempt to seek recovery for his commercial and businesses losses, despite the fact they are losses resulting from the use of a credit report solely for a business or commercial transaction, Plaintiff contends he is not basing his losses on the use of a credit report.  Plaintiff's argument fails because, without the credit report, there is no causal connection between his alleged damages and Defendant's violation of the FCRA.  And, in order for the credit report to be subject to the requirements of the FCRA, it must be a consumer report.  Thus, the use of a consumer report and the definition of a consumer report are vital to Plaintiff's FCRA claim.

The FCRA does not presume actual damages for a negligent or willful failure to comply with any of its requirements.  Plaintiff bears the burden of proving that his damages were, in fact, caused by Defendant's violation.  While the FCRA expressly provides for "actual damages" for a negligent or willful violation, §§ 1681n and 1681o also expressly provide that a violator is liable "to that consumer."  Thus, logically, Plaintiff must be acting in a consumer-capacity and must causally link his alleged damages to his status as a consumer.  In other words, Plaintiff must show Defendant's violation resulted in damages to Plaintiff as a consumer.

The term "consumer" is defined as an individual. 15 U.S.C. § 1681a(c).  Therefore, it follows that the FCRA is designed to protect consumers in their individual capacities.  In order to prove actual damages under the FCRA, Plaintiff must show Defendant's violation caused Plaintiff, as an individual consumer, the alleged damages he claims in each of the transactions at issue.  Under the facts of this case, a consumer report is necessary to make that causal connection.  As stated by House representative Sullivan, the FCRA's sponsor, on the house floor: "The purpose of the Fair Credit Reporting Bill is to protect consumers from inaccurate or arbitrary information *in a consumer report* which is used as a factor in determining an individual's eligibility for credit, insurance or employment.  It does not apply

1  to reports used for business, commercial or professional purposes." 116 Cong. Record 36,572

2  (1970) (emphasis added).

3        To further illustrate why a consumer report is vital to Plaintiff's claim, the court turns

4  to Plaintiff's alleged damages resulting from a third-party's decision to deny Plaintiff credit,

5  increase his interest rates and cancel or reduce his existing lines of credit due to Defendant's

6  erroneous reporting.  In order to be recoverable as actual damages under the FCRA, those

7  decisions must have been made based on the erroneous information reported by Defendant.

8  In order to show the decisions were made based on that erroneous information, the decision-

9  makers must necessarily have had knowledge of the erroneous information.  In order to

10  acquire such knowledge, the decision-makers must have obtained a credit report containing

11  the erroneous information.  And, in order to be subject to the FCRA, the credit report

12  obtained must have been a consumer report as defined under the FCRA.  Thus, a consumer

13  report is vital to Plaintiff's claim.  Without the consumer report, a plaintiff would essentially

14  be able to claim every undesirable financial event he encountered since the defendant's

15  violation without actually proving the event occurred because of defendant's violation, rather

16  than due to some other reason.  Accordingly, the definition of a consumer report is crucial

17  because it controls the FCRA's applicability.

18        The FCRA defines a "consumer report" as follows:

19  [A]ny written, oral, or other communication of any information by a consumer
   reporting agency bearing on a consumer's credit worthiness, credit standing,
20  credit capacity, character, general reputation, personal characteristics, or mode
   of living which is used or expected to be used or collected in whole or in part for
21  the purpose of serving as a factor in establishing the consumer's eligibility for--

22  (A) credit or insurance to be used primarily for personal, family, or household
   purposes;
23  (B) employment purposes; or
   (C) any other purpose authorized under section 1681b of this title.
24
   15 U.S.C. § 1681a(d)(1).
25
26        Some cases have either expressly or implicitly limited consideration of whether a

27  particular report is a consumer report to examining the purpose for which a particular report

28  is requested by the report's user. *See, e.g., Hovater v. Equifax, Inc.*, 823 F.2d 413 (11th Cir.

12

1   1987); *Matthews v. Worthen Bank & Trust Co.*, 741 F.2d 217 (8th Cir. 1984); *Henry v.*

2   *Forbes*, 433 F. Supp. 5 (D. Minn. 1976); *Sizemore v. Bambi Leasing Corp.,* 360 F. Supp. 252

3   (N.D. Ga.1973).  Other courts, however,  including the Ninth Circuit, have applied the FCRA

4   more broadly, focusing not only on the purpose for which the credit report was sought, but

5   also the purpose for which the information was obtained. *Hanson v. Morgan*, 582 F.2d 1214,

6   1218 (9th Cir. 1978); *see also, Ippolito v. WNS, Inc.*, 864 F.2d 440, 449 (7th Cir. 1988)*;*

7   *Heath v. Credit Bureau of Sheridan,* Inc., 618 F.2d 693, 696 (10th Cir. 1980).  Thus, in the

8   Ninth Circuit, the court must look both at the purpose for a third-party obtaining a credit

9   report and the purpose for which the information was obtained by the CRA. *Comeaux*, 915

10  F.2d at 1274*;  Hansen*, 582 F.2d at 1218; *Heath*, 618 F.2d 693.

11  
12  
13  
14  
> The law of this circuit, as well as that of almost all other circuits that have addressed the question, supports the following proposition: *If a consumer reporting agency provides a report based on a reasonable expectation that the report will be put to a use permissible under the FCRA, then that report is a 'consumer report' under the FCRA and the ultimate use to which the report is actually put is irrelevant to the question of whether the FCRA governs the report's use and the user's conduct.*

15  *Comeaux*, 915 F.2d at 1274 (emphasis in original).

16          As previously stated, Plaintiff does not dispute that the transactions at issue were

17  business and commercial transactions, nor does he argue that the CRAs believed they were

18  collecting the information for other than business or commercial purposes.  Instead, Plaintiff

19  merely states that "Section 1681b(a)(3)(F) identifies a business transaction that is initiated

20  by the consumer as a permissible purpose." (Doc. #112 at 4).  Plaintiff does not cite to any

21  authority interpreting this language, nor does he provide his own explanation for such a

22  broad and expansive interpretation.  To the contrary, Plaintiff simply concludes that it is

23  irrelevant whether a consumer report was involved in any of these transactions and, in any

24  event, a consumer report was, nevertheless, involved because they were all business

25  transactions initiated by him (*Id.*).  Plaintiff's argument lacks merit and is contrary to Ninth

26  Circuit case law.

27  
28

One of the purposes authorized under § 1681b includes furnishing a consumer report to a person which the CRA has reason to believe has a legitimate business need for the information in connection with a business transaction that is initiated by the consumer. 15 U.S.C. § 1681b(a)(3)(F). Plaintiff appears to interpret the language "business transaction that is initiated by the consumer" to cover all business and commercial transactions initiated by him regardless of whether those transactions are consumer transactions. This court declines to read § 1681b(a)(3)(F) so broadly as to essentially expand the scope and coverage of the FCRA to include all business and commercial transactions. To do so would require ignoring an essential element included in § 1681b – *a consumer report*. Thus, the court finds Plaintiff's argument fails as a matter of law for the reasons set forth below.

First, § 1681b pertains to permissible purposes under which a CRA can furnish a consumer report. The language of § 1681b does not expand the definition of a consumer report; it instructs the CRAs on when it is permissible to furnish a consumer report. Thus, a "consumer report" as defined under § 1681a(d)(1) is presupposed under this section.

Second, the language of § 1681b(a)(3)(F) clearly states the "business transaction" at issue is initiated by "the consumer." Once again, this language unequivocally makes clear that the person who is the subject of the requested report is a consumer, not a business entity or a person acting outside of his consumer-capacity. Thus, a consumer is also presupposed under this section.

Third, § 1681b(a)(3)(F) does not state that all business and commercial transactions initiated by an *individual* fall under this section. While the definition of "consumer" is an individual, the terms are not necessarily interchangeable. In other words, a consumer must be an individual and cannot be a business or a group of people; however, it does not follow that every transaction initiated by an individual is a consumer transaction or that an individual is always acting in a consumer-capacity. For example, a consumer who applies for a home mortgage would certainly fall under the protections of the FCRA. Prior to lending the consumer money for the home mortgage, a lender would obtain a consumer report on the

consumer to obtain information regarding the consumer's credit worthiness.  While a home mortgage transaction is clearly a consumer transaction, such a transaction is also a business transaction for the lender who is in the business of loaning money to consumers.  Thus, the lender is acting in a business-capacity with a business need for the information.  To put it another way, while the consumer is initiating a consumer transaction to buy a home, the lender who decides to lend that consumer money is entering into a "business transaction" initiated by the consumer.  Thus, in this transaction, the lender requesting the consumer report has a legitimate business need for the information in connection with a business transaction initiated by the consumer and, therefore, this transaction would fall under the coverage of § 1681b(a)(3)(F) as a proper purpose for obtaining a consumer report.  This interpretation is consistent with the language and the purpose of § 1681b(a)(3)(F), which is to regulate when a CRA can permissibly furnish a "consumer report" on a "consumer" to a third-party.

Finally, other Circuits, including the Ninth Circuit, have given a narrow interpretation to the "business transaction" language of § 1681b(a)(3)(F), which is contrary to Plaintiff's interpretation.  In *Mone v. Dranow*, the Ninth Circuit narrowly interpreted the language of § 1681b(3)(E)[5].  *Mone v. Dranow*, 945 F.2d 306, 308 (9th Cir. 1991).  The Ninth Circuit found that "Congress intended the FCRA to authorize a credit reporting agency to issue a consumer report to determine 'an individual's eligibility for credit, insurance or employment.'" *Id.* (citing 116 Cong.Rec. 36,572 (1970) (Statement of Rep. Sullivan)).  Thus, the Ninth Circuit determined "[r]eports used for 'business, commercial, or professional purposes' are not within the purview of the statute.'" *Id.*  Accordingly, reports used for business, commercial or professional purposes do not fall within the lawful "business need" purpose for obtaining a consumer report.  *Id.*  A lawful "business need" must be related to eligibility for credit, insurance eligibility, employment or licensing.  *Id.*

---

[5] On September 30, 1997, §1681b(3)(E), which read "otherwise has a legitimate business need for the information in connection with a business transaction involving a consumer", was amended to § 1681b(a)(3)(F).

In interpreting the "business transaction" language, the Ninth Circuit turned to the Third Circuit, in *Houghton v. New Jersey Mfrs. Ins. Co.*, 795 F.2d 1144, 1149 (3d Cir. 1986), where the Third Circuit also concluded that to fall within the business need exception, a transaction "must relate to one of the other specifically enumerated transactions in §§1681a(d) and b(3), *i.e.*, credit, insurance eligibility, employment or licensing." *Mone*, 945 F.2d at 308.   The Ninth Circuit also noted that most district courts reached similar conclusions. *Id*. (citing e.g., *Russell v. Shelter Financial Services*, 604 F. Supp. 201, 202-203 (W.D. Mo. 1984) (acquisition of credit report to ascertain whether former employee had been embezzling funds was not permissible); *Boothe v. TRW Credit Data*, 557 F. Supp. 66, 70 (S.D.N.Y. 1982) (investigating plaintiff for suspected counterfeiting activities was an impermissible purpose under § 1681b(3)(E) because there was no consumer relationship between private investigative agency and plaintiff); *Cochran v. Metropolitan Life Ins. Co.*, 472 F. Supp. 827, 830-831 (N.D. Ga.1979) (FCRA covers reports prepared to determine eligibility for insurance coverage, but not reports compiled to evaluate claims for benefits)).

In *Ippolito*, the Seventh Circuit explained that "[i]f Congress intended information concerning any 'business transaction' involving a consumer to fall within the definition of a consumer report, there would have been no reason to place into the statute § 1681a(d)'s precisely drawn language referring to information 'used or expected to be used or collected … for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes….'" *Ippolito*, 864 F.2d at 451.   The Seventh Circuit went on to state that "[i]f such a catch-all reading of [§ 1681b(a)(3)(F)] … is derived, the specifics of the preceding sections and subsections are rendered meaningless. There is no reason to enumerate covered reports if ultimately all reports are included.   An allowance of any other imaginable reports involving consumers would logically conflict with the precision and specifics of § 1681a." *Id*. at 451.   The Seventh Circuit noted:

> The primary purpose of § 1681a(d) is to define the term "consumer report." To effectuate that primary purpose, that section's precisely drawn language should

> take precedence over § 1681b when a court is examining whether a particular report falls within the definition of a "consumer report." On the other hand, the primary purpose of § 1681b is to set forth the permissible purposes for which a consumer report may be furnished by a consumer reporting agency. In determining whether a "consumer report" was disseminated for a permissible purpose, [§ 1681b(3)(F)s] broader language should then take precedence over § 1681a(d)'s more restrictive language. In other words, information that is collected and used for business transactions does not fall within the definition of a consumer report. But the mere fact that information is collected for a consumer purpose does not prevent that information from subsequently being furnished to a person who has a legitimate business need for the information.

*Ippolito*, 864 F.2d at 451.

The Sixth Circuit also observed that "[o]ur sister circuits have rebuffed efforts, based on expansive interpretations of § 1681b, to extend the Act beyond its original purpose of *consumer* protection. *Cheatham v. McCormick*, 100 F.3d 956 (6th Cir. 1996) (citing *Mone*, 945 F.2d at 308; *Ippolito*, 864 F.2d at 452; *Matthews v. Worthern Bank & Trust Co.*, 741 F.2d 217 (8th Cir. 1984) (holding that a credit report on a prospective lessee of commercial real estate was not subject to the Act) (emphasis in original)). And, while the Eleventh Circuit in *Hovater v. Equifax, Inc.*, 823 F.2d 413, 419 (11th Cir. 1987) (citing *Houghton*, 795 F.2d at 1150 (Sloviter, J. concurring)) , recognized that there are "thoughtful reasons" against giving the "business transaction" language too narrow an interpretation, no court has given it such a broad and all-inclusive interpretation as to include all of an individual's business and commercial transactions merely because they were initiated by that individual. Accordingly, Plaintiff's argument that his business and commercial transactions fall under the definition of a consumer report merely because they were business transactions he initiated is without merit. In order to meet his burden of proving actual damages under the FCRA, Plaintiff must show that each transaction at issue involved the use of a consumer report. If he cannot make that causal connection, his alleged actual damages are not recoverable under the FCRA.

Plaintiff has produced no evidence that a consumer report was used in any of his alleged damage claims; thus, the court reiterates its prior decision that Plaintiff's business and commercial transactions are not subject to the FCRA (Doc. #70). Defendant, on the other hand, has attached evidence that indicates consumer reports may have been used in

1    some of the transactions giving rise to Plaintiff's alleged damages.  Accordingly, to ensure

2    only proper alleged damage claims remain, the court addresses each of Plaintiff's alleged

3    damages subject to this motion, including Plaintiff's business and commercial transactions.[6]

4         **1.    *Dove Street Capital Lenders (the "Dove Street Loan")***

5         Plaintiff claims $800,000 in damages for having to pay higher interest rates and fees

6    on a $3,570,000 commercial loan (the "Dove Street Loan") obtained to purchase the

7    Vancouver Commercial Properties because Plaintiff was unable to refinance the loan (Doc.

8    #105 at 7).  This loan was obtained to purchase a 24-unit apartment, a strip shopping center,

9    commercial space and condominiums in Vancouver, Washington (*Id*. at 20).  Plaintiff claims

10   this loan "was to be a short term bridge loan until I could refinance the three commercial

11   properties (*Id*., Exh. J).

12        The promissory note for this loan expressly states "[m]aker is engaging in this loan

13   transaction exclusively for business or commercial purposes and not for any personal, family

14   or household purpose." (*Id*., Exh. M).  Plaintiff does not dispute this transaction was a

15   commercial transaction, nor does he argue that the CRAs believed they were collecting

16   information related to this transaction for a consumer purpose, rather than a business or

17   commercial purpose.  Thus, no consumer report was involved in this loan transaction and it

18   is not subject to the FCRA.  Furthermore, Vancouver R.E. Investments LLC entered into the

19   promissory note associated with this loan; thus, Plaintiff, as an individual consumer, was not

20   a borrower on this loan (Doc. #105, Exh. M).  The FCRA only protects individual consumers,

21   not business entities, and any damages associated with this loan were suffered by Vancouver

22   R.E. Investments LLC, not Plaintiff as an individual consumer.  Accordingly, these damages

23   are not recoverable under the FCRA.

24

25

26

27        [6] The court notes that Plaintiff did not dispute Defendant's factual background and summary of Plaintiff's alleged damages.  Therefore, the court assumes Defendant's statements with regard to each transaction are accurate and undisputed.

28
                                        18

**2.** ***Loans from family and friends to pay the Dove Street Loan monthly payments ($50,000 - parents; $105,000 - Randall Wright; $325,000 - Lloyd Austin)***

Plaintiff alleges he had to borrow money from his parents, Randall Wright and Lloyd Austin in order to pay the $45,000 monthly payments on the Dove Street loan listed above (Doc. #105 at 20).

First, Plaintiff does not dispute that he borrowed money for the sole purpose of paying the monthly payment on a commercial loan; thus, these loans are business-purpose loans not subject to the FCRA. Furthermore, Plaintiff has not alleged a consumer report containing the erroneous information played any role in these transactions; therefore, Plaintiff has failed to show how Defendant's violation caused him harm in these loan transactions. Plaintiff merely alleges he needed to borrow money from family and friends because he could not obtain business and commercial loans elsewhere. Plaintiff has pointed to no provision in the FCRA or to any case law supporting his contention that loans from family and friends made to cover his commercial loan payments somehow fall under the protections of the FCRA.

Second, even if borrowing money from family and friends is consumer in nature, Plaintiff failed to show that his family and friends somehow relied on the erroneous information reported by Defendant to Plaintiff's detriment in lending Plaintiff money. Accordingly, Plaintiff has failed to causally link these loans to Defendant's violation as required under the FCRA. Plaintiff does not claim that, based on the erroneous information reported by Defendant, his friends and family members charged him higher interest rates or excessive fees, or even loaned Plaintiff less money because they thought he was a credit risk. To the contrary, Plaintiff claims he paid a high interest rate on a $50,000 loan from his stepfather because that money was tied up on second trust deeds and he "wasn't gonna turn around and take money out of his pocket that he couldn't get elsewhere." (Doc. #105, Exh. A, p. 77). Plaintiff does not claim his step-father charged him a higher interest rate because of the information reported by Defendant to the CRAs.

Without the causal link, Plaintiff cannot prove actual damages.  For example, if a plaintiff is unable to obtain a home mortgage due to inaccurate information contained in his credit report, he may be able to recover his actual damages associated with the denial of credit.  Now suppose the plaintiff borrows $300,000 from his parents to purchase the home. Plaintiff could not recover damages from the furnisher for the first denial of credit and the $300,000 his parent's loaned him to buy his home.  To allow such damages would put the plaintiff in a better position than he was in prior to the inaccurate reporting.  Ultimately, the defendant would be paying for the plaintiff's home.  If, on the other hand, the plaintiff could show he would have obtained a $300,000 loan from another source at a lower interest rate but for the inaccurate information *and* his parents charged him a higher interest rate *because of* the inaccurate information contained in his credit report, then he may be able show he suffered actual damages in the loan from his parents.  Plaintiff has not made such a showing here.

Under these facts, Plaintiff has failed to make the causal link between any of these loans and Defendant's violation in order to show he was damaged by such loans in his consumer-capacity.  Nor has he shown that any of his family and friends relied, to his detriment, on the erroneous information reported by Defendant.  Accordingly, these loans are not subject to the FCRA.

### 3. *Southern Oregon Investment Group (SOIG)*

Plaintiff alleges he suffered $426,176 in damages by having to borrow funds from Southern Oregon Investment Group (SOIG).  Defendant asserts SOIG is a hard money lender who brokers money for private investors (Doc. #105 at 8).  Defendant further asserts SOIG brokered the Dove Street Loan and several other hard money loans for Tahoe Reno Development and Vancouver R.E. totaling $1,935,000 (*Id.*).  Defendant asserts all the loans made by SOIG investors and other entities owned by Mr. Chris Thompson (owner of SOIG) contain the following provision" "[m]aker is engaging in this loan transaction exclusively for

1  business and commercial purposes and not for any personal, family or household purposes."

2  (Doc. #105 at 9).

3      Plaintiff does not dispute that his loan documents dealing with any of the SOIG

4  transactions at issue contained the express provision above, nor does he argue that the CRAs

5  believed they were collecting any information related to these loans for a consumer purpose,

6  rather than a business or commercial purpose.  The language of the loan provision is

7  unambiguous – the loan transactions were exclusively for business and commercial purposes.

8  Furthermore, the evidence shows Tahoe Reno Development, LLC and Vancouver R.E. entered

9  into the various promissory notes associated with SOIG, not Plaintiff as an individual

10  consumer (*Id*., Exh. P).  The FCRA only protects individual consumers, not business entities,

11  thus any damages sustained by these business entities are not recoverable under the FCRA.

12  Additionally, no consumer reports were involved in these loan transactions; thus, they are not

13  subject to the FCRA.[7]

14      ### 4.   *Late fees and costs on rental properties*

15      Plaintiff alleges $89,640 in damages for late fees and costs his companies incurred

16  because they were making their mortgage payments late (Doc. #105 at 9).  All late fees, except

17  those related to the Erna Way and James Lane properties, were paid by Plaintiff's limited

18  liability companies (*Id*.).  As previously explained, the FCRA only protects individual

19  consumers and not business entities; therefore, any late fees incurred by Plaintiff's limited

20  liability companies are not recoverable under the FCRA.  Furthermore, any late fees Plaintiff

21  incurred and paid related to his business and commercial transactions are not consumer

22  transactions; thus, they are not subject to the FCRA.

23      Plaintiff also alleges he suffered $5,410.24 in damages for foreclosure late fees on

24  5102-5108 Fessenden in Portland, Oregon; however, it appears Portland R.E. owns this rental

25

26  [7] In his deposition, Plaintiff does indicate he borrowed $150,000 from Mr. Thompson to finish his personal house. To the extent this loan is a consumer loan, it is subject to the FCRA (Doc. #105 , Exh. A, p. 29).

27  At this point, however, Plaintiff has produced no evidence indicating Mr. Thompson relied on the erroneous information reported by Defendant with regard to this loan.

28

property and paid the fees associated with this property (Doc. #105 at 9-10).  Portland R.E. is a business entity, not a consumer; therefore, any late fees incurred by Portland R.E. are not recoverable under the FCRA.

### 5.   *James Lane property*

Plaintiff alleges $880,000 in damages as a result of being unable to refinance and finish construction on the James Lane Property (*Id*. at 10).  Plaintiff also alleges $12,000 in attorney's fees associated with fees incurred to pay off the seller of the James Lane property (*Id*.).  Finally, Plaintiff alleges $39,520 in damages due to higher interest rates associated with this property (*Id*).  Defendant asserts that The Deed of Trust related to this property expressly states: "[m]aker is engaging in this loan transaction exclusively for business or commercial purposes and not for personal, family or household purposes." (*Id*. at 22).

Plaintiff states in his deposition that the James Lane Property is his personal residence and he was unable to finish construction on his personal residence due to Defendant's violation (*Id*., Exh. A., p. 65).  Plaintiff further states the seller of the James Lane Property filed a lawsuit against him when he couldn't refinance the second mortgage the seller carried on the property and he incurred legal fees in order to avoid the seller putting the property in foreclosure (*Id*. at 72).  Although the Deed of Trust states this loan transaction is exclusively for business or commercial purposes, given this property is the personal residence of Plaintiff, it is unclear whether any of the other transactions associated with this property, *e.g*., the second mortgage carried by the seller and any attempts to refinance that loan, were consumer-related or strictly business-related transactions.  As such, under these facts, there are genuine issues of material fact in dispute as to whether Plaintiff suffered actual damages in his consumer-capacity related to this property.  If Plaintiff was acting in his consumer-capacity with respect to any transactions associated with this property during the relevant time frame, Plaintiff may be entitled to actual damages if he can make the causal link between those damages and Defendant's violation.

///

### **6.** *Anticipated profits on Cashill subdivision*

Plaintiff alleges $6,250,000 in lost profits due to his inability to develop as many lots as anticipated in the Cashill subdivision because, during the time he was unable to obtain financing, the City of Reno changed the hillside ordinance to allow for fewer lots (Doc. #105 at 28-29, Exh. A, p. 73-75). Specifically, Plaintiff alleges Defendant is responsible for his inability to finance a lawsuit against the City of Reno and pay his engineers to draft new plans prior to the City of Reno changing the Hillside Ordinance (*Id*. at 11). Plaintiff claims that the City of Reno changed the Hillside Ordinance from a maximum of 70 lots to 28 lots during the time Plaintiff's finances were affected by Defendant's reporting, and due to his financial difficulties, he was unable to develop the property prior to the ordinance change and was also unable to finance a lawsuit against the City of Reno regarding this change (*Id*., Exh. B, p. 27, Exh. K, p. 4, Exh. T). Plaintiff blames Defendant for the 2003 lawsuit lasting until 2005 because he didn't have enough money to process the lawsuit faster and "turn around and, and re-engineer everything to push it forward with a new application." (*Id*., Exh. B, p. 31-34).

Defendant contends the successful development and sale of these lots depends upon the City of Reno's approval of the tentative map, state of the market and many other contingencies (*Id*. at 29). Defendant further asserts it is impossible to determine the profit, if any, Tahoe Reno Development would have derived from the sale of the lots in this subdivision (*Id*.). Ultimately, Defendant argues Plaintiff's damages are too speculative.

Plaintiff responds that his anticipated real estate profits are not speculative because he has been buying, holding and selling real estate prior to Defendant's noncompliance and there are other companies buying and selling real estate throughout the areas where Plaintiff owned his properties (Doc. #112 at 6). Thus, Plaintiff argues that there is information available to the public which provides many different statistics and trends within the real estate market and the profits from the development of the Cashill subdivision are not speculative because similar properties in Reno were developed in known quantities (*Id*.).

First, Plaintiff does not deny that these alleged damages relate to Plaintiff's business of "buying, holding and selling real estate." (Doc. #112 at 6). Plaintiff claims he searched for the money to develop these lots , which is why he went to U.S. Bank (Doc. #105 , Exh. A, p. 76). For the reasons set forth in great detail above, any credit reports used in connection with obtaining financing for these transactions are not subject to the FCRA because these transactions are commercial transactions.

Second, although Plaintiff asserts he tried to use his personal residence as collateral on a development loan, Plaintiff has not argued that the CRAs believed they were collecting any information related to his attempts to obtain financing for consumer rather than commercial purposes. As the *Boothe* court explained, to which the Ninth Circuit cited: "It is clear from its legislative history that the Act was intended to apply only to reports which relate to the consumer's eligibility for personal credit or other commercial benefits as a consumer, and not to the consumer's business transactions." *Boothe*, 523 F. Supp. at 633. Accordingly, without the use of a consumer report, any lost business opportunities and anticipated profits relating to Plaintiff's inability to buy, hold and sell real estate are business damages not recoverable under the FCRA.

Third, Plaintiff has failed to make the necessary causal link between his status as a consumer and Defendant's violation with regard to his inability to finance a lawsuit against the City of Reno regarding an ordinance change. The evidence indicates the lawsuit at issue was brought by W.W. Johnson Development Corporation and Leonard Detrick (Doc. #105, Exh. W). Plaintiff, individually, was not a party to this lawsuit; thus, Plaintiff cannot claim consumer damages stemming from a lawsuit brought by his corporation. Furthermore, even if the inability to "finance a lawsuit" is a cognizable damage claim under the FCRA, under these facts, Plaintiff has failed to make the necessary causal connection between Defendant's violation and Plaintiff's inability to finance a lawsuit that wholly unrelated to Defendant's violation against a third-party.

///

### 7. *Detrick Loan*

_____Plaintiff alleges $168,000 in damages because Tahoe Reno Development had to pay extension fees on the loan it obtained from Leonard Detrick to purchase the Cashill subdivision (Doc. #105 at 11-12).

Plaintiff, as an individual consumer, was not a borrower on the Detrick loan (*Id*. at 22, Exh. Y). The FCRA only protects individual consumers, not business entities; thus, any fees paid or damages incurred by Tahoe Reno Development are not recoverable under the FCRA.

### 8. *Erna Way*

Plaintiff alleges $46,000 in damages as a result of having to pay extra interest and fees associated with refinancing this property (*Id*. at 13). Defendant asserts Plaintiff's purpose in refinancing this rental property was to obtain money to pay the $45,000 monthly payment on the Dove Street Loan (*Id*. at 22).

Plaintiff does not dispute this property is a rental property. Nor does he dispute that he refinanced this property in order to pay the $45,000 monthly payment on the Dove Street Loan. The record indicates Plaintiff eventually obtained the funds to refinance this property from United Security Financial (*Id*., Exh. BB). The record also indicates, however, that Plaintiff, as an individual, borrowed funds to refinance this property (*Id*.). There is no "commercial purpose" provision in the loan agreement. Furthermore, the loan applications associated with this transaction are residential loan applications in which Plaintiff, individually, is the borrower on each application (*Id*., Exh. AA).

Under these facts, although Plaintiff lists rental income associated with this property on the loan applications and admits this property is a rental property, there are genuine issues of material fact as to whether the CRAs believed they were collecting information with regards to these loan applications for consumer purposes. If so, a consumer report was likely involved in these transactions, thus, subjecting them to the FCRA. If Plaintiff shows he applied for these loans as a consumer and was denied credit or suffered some other damages

25

1  as a result of the erroneous information reported by Defendant contained in his consumer

2  report, he will be entitled to any actual damages sustained.

3         **9.**    **Sale of 21 properties**

4        Plaintiff alleges $11,741,500 in damages for lost profits from having to sell twenty-one

5  (21) properties earlier than anticipated (Doc. #105 at 28).  Plaintiff further alleges $683,800

6  in damages for lack of cash flow on these properties (*Id.* at 13).

7        After purchasing the properties at issue, Plaintiff apparently transferred said

8  properties to his limited liability companies (*Id.*).  Plaintiff does not dispute that he was not

9  the owner of the properties in question at the time of the sales.  Accordingly, any anticipated

10  profits and cash flow would have been realized by Plaintiff's limited liability companies and

11  not Plaintiff.  And any losses associated with these sales would also have be realized by

12  Plaintiff's limited liability companies, as well.  Because the FCRA only protects individual

13  consumers, losses to Plaintiff's limited liability companies are not recoverable under the

14  FCRA.

15         **10.**    **Lost business opportunities on 50 transactions**

16        Plaintiff alleges $9,420,450 in damages for lost business opportunities to purchase

17  real estate on approximately fifty (50) transactions (*Id.*).  Defendant asserts Plaintiff has

18  provided no evidence of a credit report being obtained in connection with any business

19  opportunity he was denied due to Defendant's reporting and any real estate transaction he

20  would have entered would have been for a business purpose (*Id.* at 24).

21        In the Ninth Circuit, a denial of credit is not a prerequisite to recovery under the

22  FCRA. *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)**.**

23  However, Plaintiff must still prove his alleged damages were caused by Defendant's failure

24  to comply with the FCRA, which as explained in detail *supra*, is done through the use of a

25  consumer report.  Plaintiff is not entitled to business damages unrelated to his status as a

26  consumer as the FCRA was designed to protect the individual consumer, not the individual's

27  businesses.  Plaintiff has failed to show a consumer report was involved in any of these fifty

28

1   (50) transactions.  Nor has Plaintiff argued a CRA believed it was collecting information for

2   a consumer purpose in any of these fifty (50) transactions.  Accordingly, these transactions

3   are not subject to the FCRA.

4           **11.   *Sky T Stock***

5           Plaintiff alleges $25,000 in damages as a result of having to sell his Sky T stock early

6   in order to pay the Dove Street Loan monthly payments (Doc. #105 at 23).  Plaintiff asserts

7   that "[b]ut for the financial position the Plaintiff found himself in because of Defendant's

8   non-compliance with the FCRA, he would not have sold the stock when he did (Doc. #112 at

9   6).  Plaintiff further asserts the stock split after he was forced to sell and the stock value today

10  is $25,000 higher than it was at the time he was forced to sell (Doc. #105 at 15).

11          Defendant argues fluctuations in the stock market are too speculative and uncertain

12  on which to base an award of damages (Doc. #105 at 29).

13          As previously explained, a denial of credit is not a prerequisite to recovery under the

14  FCRA; however, Plaintiff must show his damages were, in fact, caused by Defendant's failure

15  to comply with the FCRA. *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329,

16  1333 (9th Cir. 1995)**.**  There must be a causal relation between Defendant's violation and the

17  alleged harm.  In other words, the decision that resulted in the alleged harm must have been

18  made based on the erroneous information reported by Defendant, which was contained in a

19  consumer report.

20          Here, the alleged harm is Plaintiff's decision to sell his stock prematurely.  Plaintiff

21  asserts he made the decision to sell his stock early based on the erroneous information

22  Defendant reported to the CRAs.  Plaintiff also asserts he ran his credit every month (Doc.

23  #105, Exh, A, p. 67).  Thus, the question becomes whether Plaintiff's decision to sell his stock

24  prematurely because of Defendant's erroneous reporting, which he obtained when he ran his

25  credit and obtained a consumer report, constitutes actual damages recoverable under the

26  FCRA.

27

28

While Plaintiff does state he was forced to sell his stock because he needed the money to make his $45,000 monthly Dove Street Loan payments, Plaintiff also states he was "scrambling" and had to refinance every piece of property he owned to keep his head above water (Doc. #105, Exh. A, p. 77).  It is unclear whether Plaintiff was scrambling to keep his head above water solely in his business-capacity or in his consumer-capacity, as well. Viewing the facts and the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact as to whether these alleged damages are cognizable under the FCRA. In the event such damages are cognizable, which will be determined at the time of trial, the court will then consider whether Plaintiff's stocks are too speculative and uncertain to base an award of damages.

### 12.   *Interest on son's student loans*

Plaintiff alleges $4,576 in damages for interest he paid on his son's college loans because he was unable to pay off the balances as promised (Doc. #105 at 15, Exh. HH). Plaintiff asserts he agreed to pay off his son's college loans if his son received a degree in Business Administration and his son graduated in December 2004 (*Id.*, Exh. HH).  Plaintiff asserts he has been unable to take care of this obligation and, instead, has had to pay the interest on these loans (*Id.*).

Plaintiff has failed to make any casual connection between his son's student loans and the erroneous information reported by Defendant obtained in Plaintiff's consumer report. Even if Plaintiff borrowed these loans on his son's behalf, these loans were made prior to Defendant's reporting and, thus, any credit reports involved in these loan transactions would not have contained the erroneous information.  Plaintiff cannot claim damages for interest he pays on his own loans obtained prior to Defendant's erroneous reporting simply because he was planning to pay them off. Yet, he attempts to do that here with his son's student loans.

Plaintiff must prove causation between his alleged damages and Defendant's violation and, while normally the issue of causation is left for a fact finder to determine, Plaintiff must at least allege his damages were a result of inaccuracies in his consumer report or provide

evidence to support his theory of liability. *Guimond*, 45 F.3d at 1333.  Plaintiff has failed to provide any evidence to support his theory of liability that Defendant's violation affected his business, which in turn affected finances, which in turn affected his ability to keep his promise to his son to pay off his son's student loans.  Furthermore, the evidence shows these loans are Plaintiff's son's loans, borrowed in his son's name; therefore, any damages resulting from Plaintiff's failure to keep his promise to his son were suffered by his son and not by him.  Accordingly, these alleged damages are not recoverable under the FCRA.

### 13.   *Credit cards*

Plaintiff alleges his credit limits were decreased on his Providian and Bank of America credit cards (Doc. #105 at 15).[8]  Defendant contends Plaintiff used these credit cards for business purposes, such as financing improvements and refurbishments made to Plaintiff's companies' rental properties; therefore, any credit reports used in connection with these credit cards was for business purposes (*Id.*).

Plaintiff does not dispute that he used the credit cards at issue for business purposes.  However, the evidence shows that, in a letter dated December 21, 2004, Plaintiff was notified that his Bank of America credit card limit was reduced and that letter expressly states "[i]n reaching our decision, we relied on internal information as well as information in the *consumer credit report* of the first person named above." (*Id.* (emphasis added)).  Thus, even if Plaintiff used this credit card for business purposes, a consumer report was involved in the decision to reduce Plaintiff's line of credit and, therefore, this transaction is subject to the FCRA.  Likewise, in a letter dated January 20, 2005, Plaintiff was notified that his Providian credit limit was being reduced (*Id.*, Exh. JJ).  This letter also indicates a consumer report was involved in this transaction, as the letter expressly states "[w]e received credit information from TransUnion *Consumer* Relations ..." (*Id.* (emphasis added)).  Thus, again, although Plaintiff may have used this credit card for business purposes, the evidence shows a consumer

---

[8]Defendant contends that Plaintiff claims credit limits were decreased on four credit cards, but Plaintiff has only provided evidence for these two cards.  Plaintiff did not dispute this contention.

1    report was, in fact, involved in the decision to reduce Plaintiff's line of credit and, therefore,

2    this transaction is also subject to the FCRA.  Accordingly, these damages are recoverable

3    under the FCRA if Plaintiff can show the credit limits were reduced because of Defendant's

4    erroneous reporting.

5    ### 14.   *Credit lines*

6    Plaintiff alleges damages for denials of credit when he attempted to obtain a $500,000

7    credit line from U.S. Bank and from Nevada National Bank in order to complete

8    improvements on commercial properties located in Vancouver, Washington and to pay off

9    the Dove Street Loan (Doc. #105 at 24).

10   Plaintiff does not dispute he applied for a line of credit for business purposes; however,

11   Plaintiff does allege he attempted to obtain this line of credit on his personal residence (*Id.*,

12   Exh. O).  Under these facts, there are genuine issues of material fact as to whether a consumer

13   report containing the erroneous information reported by Defendant was involved in the

14   decisions to deny Plaintiff's applications for credit.  In other words, despite Plaintiff's purpose

15   for obtaining the line of credit, it is unclear whether he applied for said credit as a consumer

16   with the intent to use the credit for a business purpose.  It is also unclear whether the CRAs

17   believed they were collecting the information for a consumer purpose.  If Plaintiff can show

18   that he was denied the credit at issue because of erroneous information reported by

19   Defendant contained in a consumer report, these damages are recoverable under the FCRA.

20   No evidence has been produced  either proving or disproving the use of a consumer report;

21   therefore, the court will allow Plaintiff to proceed through trial on these alleged damages.

22   For the reasons set forth above, summary judgment on Plaintiff's actual damage claims

23   subject to the instant motion are **GRANTED in part** and **DENIED in part** as set forth at

24   the end of this order.

25   ## C.   **Statutory Damages**

26   Section 1681n provides for statutory damages for a willful noncompliance with the

27   FCRA. Specifically, § 1681n(a)(1)(A) provides that "[a]ny person who willfully fails to comply

28

1   with any requirement imposed under this subchapter with respect to any consumer is liable

2   to that consumer in an amount equal to the sum of any actual damages sustained by the

3   consumer as a result of the failure *or* damages of not less than $100 and not more than

4   $1,000." 15 U.S.C. § 1681(n)(1)(A) (emphasis added).

5     There are genuine issues of material fact as to whether Plaintiff can prove any actual

6   damages; however, even absent actual damages, if Plaintiff proves a willful noncompliance

7   with the FCRA, he will be entitled to statutory damages.  On this basis, summary judgment

8   is inappropriate at this time and must be **<u>DENIED</u>**.

9   **D.   Punitive Damages**

10    Section 1681n also provides for punitive damages at the court's discretion for a willful

11  noncompliance with the FCRA.  15 U.S.C. § 1681n(a)(2).  Thus, if Plaintiff proves a willful

12  noncompliance with the FCRA, he may be entitled to punitive damages.  Accordingly,

13  summary judgment is inappropriate at this time and must be **<u>DENIED</u>**.[9]

14    **<u>30-DAY REINVESTIGATION PERIOD AND WHEN LIABILITY ATTACHES</u>**

15    Defendant contends that, as a matter of law, it cannot be held liable for Plaintiff's

16  business losses that predate its alleged failure to reinvestigate (Doc. #105 At 24-27).

17  Defendant asserts, therefore, that the earliest it can be held liable for any damages sustained

18  by Plaintiff is January 14, 2005, thirty (30) days after the December 14, 2004 Credit Report

19  Dispute Form was filed by Plaintiff (*Id*. at 26).

20    Plaintiff simply argues Defendant does not cite to any legal authority to support its

21  contention (Doc. #112 at 5).

22    Section 1681s-2(b) imposes a duty of reinvestigation on furnishers of information,

23  which arises when a furnisher receives notice of a dispute regarding the accuracy of

24  information they provided to a CRA. 15 U.S.C. § 1681s-2(b)(1). Section 1681s-2(b)(2) further

25  provides that "[a] person shall complete all investigations, reviews and reports required

26

27     [9] Whether Plaintiff has sufficiently pled a willful violation to sustain a punitive damages claim is discussed
in further detail *infra*.

28

1  under paragraph (1) ... before the expiration of the period under section 1681i(a)(1) of this

2  title within which the consumer reporting agency is required to complete actions required by

3  that section regarding that information." 15 U.S.C. § 1681s-2(b)(2).

4      The Ninth Circuit has made clear that a furnisher's duty to reinvestigate is not

5  triggered until *after* the consumer notifies the CRA *and* the CRA then notifies the furnisher.

6  *See Nelson*, 282 F.3d at 1060. Furthermore, the Ninth Circuit has expressly held that "[t]he

7  FCRA does not impose strict liability ..." *Guimond*, 45 F.3d at 1333. Just as a CRA can escape

8  liability by establishing that an inaccurate report was generated despite the CRA following

9  reasonable procedures; so, too, can a furnisher escape liability by showing that it properly

10 reinvestigated the disputed information. Accordingly, liability cannot attach until a furnisher

11 violates its duty to properly reinvestigate.  A furnisher has thirty (30) days to properly

12 reinvestigate.  Thus, no violation can occur until after the 30-day deadline for completing a

13 proper reinvestigation has expired.

14     Other district courts have drawn similar conclusions.  In *Acton v. Bank One*

15 *Corporation*, 293 F. Supp. 2d 1092, 1100 (D. Ariz. 2003), the district court found the plaintiff

16 could not have been damaged by the CRA's failure to comply with § 1681i until the 30-day

17 reinvestigation period expired. *See* 15 U.S.C. § 1681i(a)(1)(A).  In *Acton*, the plaintiff claimed

18 he was damaged by his inability to purchase a home; however, the evidence showed the

19 plaintiff cancelled the contract more than two weeks prior to the expiration of the 30-day

20 reinvestigation period. *Id*.  Because the plaintiff cancelled the home purchase prior to the

21 expiration of the reinvestigation period, the court found the CRA's failure to reinvestigate did

22 not cause the cancellation and, therefore, could not have formed the basis for actual damages

23 under the FCRA. *Id*.  The Court expressly agreed with the defendant's contention that

24 "Plaintiff could not have been damaged by Equifax's failure to comply with § 1681i until the

25 30-day reinvestigation period expired." *Id*.

26     In *Lawrence v. Trans Union LLC*, 296 F. Supp. 2d 582, 587 (E.D. Pa. 2003), the

27 district court also expressly found that "liability arises under 1681i thirty days after the

28

consumer reporting agency receives notice of the disputed item from the consumer." Section 1681s-2(b)(2) explicitly refers back to § 1681i in determining when the investigations, reviews and reports required under this section are due.  Thus, if liability under § 1681i does not attach until after the 30-day reinvestigation period expires and § 1681s-2(b)(2) refers us back to § 1681i's 30-day reinvestigation period, then liability under § 1681s-2(b) also does not attach until after the expiration of that same reinvestigation period.

This court's interpretation is further supported by the Ninth Circuit, in *Guimond*, where the Ninth Circuit expressly found that in order to prove a CRAs liability under § 1681i(c), the plaintiff must show she disputed an item in her file *and* that any reinvestigation conducted by the CRA did not resolve the dispute. *Guimond*, 45 F.3d at 1335.  In order to show that any reinvestigation conducted by the CRA did not resolve the dispute, the 30-day reinvestigation period must have necessarily expired.  Similarly, in order to show any reinvestigation conducted under § 1681s-2(b) by a furnisher of information did not resolve the dispute, the 30-day reinvestigation period must have expired.

While Plaintiff argues that Defendant cites to no legal authority to support its contention that it is not liable for any damages predating its duty to reinvestigate, Plaintiff cites to no authority to dispute this contention; but, rather, briefly states that because Defendant cites to none, Defendant's motion must be denied.  This court's reading of the statute and the persuasive authority cited above supports Defendant's contention.  Plaintiff filed a Credit Report Dispute Form on December 4, 2004 (Doc. #105 at 26).  Assuming Defendant was properly notified of the disputed information on that same date, Defendant's liability under § 1681s-2(b) would not attach until thirty (30) days later.  Accordingly, Defendant's request for summary judgment on damages predating Defendant's alleged failure to reinvestigate is **<u>GRANTED</u>**.

### ANTICIPATED PROFITS

Defendant seeks summary judgment on Plaintiff's three damage claims relating to anticipated profits asserting they are barred as a matter of law (*Id.* at 28).  The three damage

claims at issue are: 1) $11,741,500 in lost profits on twenty-one (21) properties Plaintiff alleges he had to sell earlier than anticipated; 2) $6,250,000 in lost profits on the undeveloped Cashill subdivision; and 3) $25,000 in lost profits on Plaintiff's Sky T stock that Plaintiff alleges he had to sell earlier than anticipated.

The court has already determined that Plaintiff's damage claims for lost profits on the sale of the twenty-one (21) properties at issue and the undeveloped Cashill subdivision are not recoverable under the FCRA; therefore, the court need not determine whether said profits are too speculative or contingent to be recoverable.  The court also determined that there are genuine issues of material fact as to whether Plaintiff's Sky T stock is recoverable under the FCRA.  In the event such damages are cognizable, which will be determined at the time of trial, the court will then consider whether Plaintiff's stocks are too speculative or contingent to base an award of damages.  Accordingly, summary judgment on Plaintiff's lost profits associated with the twenty-one (21) properties and the Cashill subdivision is **GRANTED**. Summary judgment on Plaintiff's damages associated with the Sky T stock is **DENIED**.

### LOST REAL ESTATE OPPORTUNITIES

Defendant seeks summary judgment on Plaintiff's damage claim for $9,420,450 for missing out on fifty (50) real estate transactions (Doc. #105 at 29).  Defendant contends there is no authority that would entitle Plaintiff to damages based on Plaintiff's own personal decision not to apply for credit out of fear of his own credit report (*Id*. at 30).

The court already determined that Plaintiff failed to show a consumer report was involved in any of the fifty (50) real estate transactions at issue; thus, these transactions are not subject to the FCRA. Accordingly, the court need not address whether Plaintiff's personal decision not to apply for credit in these transactions entitles Plaintiff to recoverable damages

1   under the FCRA.[10]   Accordingly, summary judgment on these fifty (50) real estate

2   transactions is **GRANTED**.

3                              **PUNITIVE DAMAGES**

4          Defendant seeks summary judgment on Plaintiff's punitive damages claim contending

5   Plaintiff failed to plead sufficient facts to show Defendant's alleged failure to reinvestigate

6   was willful (Doc. #105 at 30).  Defendant contends Plaintiff has pled no facts and presented

7   no evidence to support his claim that Defendant knowingly or recklessly failed to

8   reinvestigate the information it reported to the CRAs (*Id.*).  Defendant argues that Plaintiff's

9   Complaint contains a number of reinvestigation actions undertaken by Defendant; therefore,

10  summary judgment on this claim is appropriate (*Id.*).

11         Plaintiff argues Defendant is making a motion to dismiss the complaint based on an

12  alleged deficiency in the pleadings and the time for such a motion has long passed (Doc. #112

13  at 7).  Plaintiff further argues that he has offered direct testimony and documentation

14  regarding Defendant's willful non-compliance and has previously noticed the depositions of

15  Defendant's persons most knowledgeable and Ms. Drzewicki, but Defendant requested they

16  be taken off calendar until a mutually convenient date could be reached between the parties

17  (Doc. #112 at 7).

18         As previously discussed, an award of punitive damages under the FCRA is within the

19  discretion of the court, provided Plaintiff proves Defendant's violation was willful.  The

20  Supreme Court, affirming the Ninth Circuit's interpretation of "willfullness", defined

21  "willfull" for purposes of the FCRA in *Safeco Ins. Co. of America v. Burr*, ---- U.S. ----, 127

22  S.Ct. 2201, 2208 (2007), in which the Court held that willful extends to acts known to violate

23  the FCRA, as well as a reckless disregard of a statutory duty.  The Court defined recklessness

24

---

25         [10] The court notes that the Ninth Circuit has recognized a damage claim for lost opportunities, *i.e.*, being
      deterred from applying for credit pending resolution of inaccurate reporting. *See Guimond*, 45 F.3d at 1332, n.2;
26    *see also*, *Cairns v. GMAC Mortg. Corp.*, ---- F. Supp. 2d ---- (D. Ariz. 2007), 2007 WL 735564 (D. Ariz. 2007)
      (official citation not available) (agreeing that the Ninth Circuit previously recognized that damages may flow from
27    a consumer being deterred from exercising his or her right to apply for credit as a result of inaccurate reporting
      until the erroneous information is deleted).
28

as "generally understood ... as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that is should be known.'" *Id.* at 2215 (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The Ninth Circuit has determined that a company is liable for a willful violation of the FCRA if it "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Reynolds v. Hartford Financial Services Group, Ins.*, 435 F.3d 1081, 1085 (9th Cir. 2006), rev'd on other grounds by *Safeco*, 127 S.Ct. 220. A conscious disregard is "either knowing that policy to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy contravened those rights." *Id.* (citing *Cushman*, 115 F.3d at 227).[11]

Here, Plaintiff asserts the following facts in support of his willful violation claim.[12] On or about December 13, 2004, Plaintiff was alerted by his credit report service that a derogatory item was being reported on his credit report by Defendant (Loan 56) (Doc. #66 at 6). Plaintiff then notified each of the big CRAs that he disputed the information reported by Defendant (*Id.*).[13] Defendant had 30-days from being notified of the dispute by the CRAs to reinvestigate the disputed information. During that 30-day period, Defendant sent letters to Plaintiff notifying him that Loan 56 was in default (*Id.*). Then, on or about January 3, 2005, Plaintiff personally notified Defendant that he was being damaged as a result of

---

[11] The Ninth Circuit adopted the Third Circuit's definition of "willfully," as employed under the FCRA. *Reynolds*, 435 F.3d at 1098 (quoting *Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3d Cir. 1997)), rev'd on other grounds by *Safeco*, 127 S.Ct. 220. However, at least one district court, in *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197 (C.D. Cal. 2007), found the Ninth Circuit's definition of recklessness may be slightly more expansive than the Supreme Court's definition in *Safeco*. *Id.* at 1209 ("The circuit court's definition of the standard for recklessness appears to be slightly more expansive than that set forth in Safeco, however. The Ninth Circuit holds that '"willfully" entails a "conscious disregard" of the law, which means "either knowing that policy [or action] to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy [or action] contravened those rights."").

[12] The Court notes that Defendant's liability did not attach until after the 30-day reinvestigation period expired; therefore, the court only considered actions taken by Defendant after that period in determining if Plaintiff has provided sufficient evidence to support his willful violation claim.

[13] The record indicates Plaintiff filed a Credit Report Dispute Form on December 14, 2004 (Doc. #105 at 26).

Defendant's failure to correct its inaccurate reporting of Loan 56 (Doc. #66 at 6).  On or about January 5, 2005, Plaintiff received a letter from Defendant acknowledging that Defendant had misapplied check number 1080 to Loan 55, rather than Loan 56; but that it would not correct its error because Loan 55 was delinquent (*Id*.).  Plaintiff then telephoned Defendant and informed Defendant that it was mistaken about Loan 55 being delinquent and Defendant confirmed this information, assuring Plaintiff that check 1080 would be reversed and applied to Loan 56 (*Id*. at 6-7).  Next, on or about February 3, 2005, Plaintiff received a letter from Ms. Kathy Drzewiecki of the Executive Communications Division assuring Plaintiff she would review the disputed information and, on that same date, Plaintiff received a letter from Well's Fargo's Default Administration stating that it was contacting the various CRAs and instructing them to correct the previously reported inaccurate information regarding Loan 56 (*Id*. at 7).  On or about February 11, 2005, Plaintiff received a letter from Ms. Drzewiecki confirming that check 1080 had not been applied to Loan 56 and was, in fact, applied to Loan 55; however, Ms. Drzewiecki stated Defendant would not correct its error because Loan 55, to which it had been applied, was delinquent (*Id*.).  Plaintiff contends Loan 55 was not delinquent (*Id*.).  On or about March 21, 2005, Defendant again notified Plaintiff that Loan 56 was in default and seriously delinquent and, on or about March 30, 2005, Plaintiff sent another letter to Defendant regarding its error (*Id*.).  Plaintiff also sent the following letters to Defendant: 1) April 1, 2005, letter confirming his telephone conversation with Ms. Drzewiecki outlining events leading up to this date; 2) April 4, 2005, notice of adverse action taken against him by other banks and lenders; and 3) April 4, 2005, letter regarding Bank of America's decision to reduce his credit line (*Id*. at 8).  Defendant then sent Plaintiff a letter, on or about April 7, 2005, including two (2) copies of check 1080, one which was Plaintiff's copy he originally sent to Defendant in October of 2004 and the other which was a copy of the electronically cashed check that had been applied to Loan 55 (*Id*.).  Plaintiff's copy of check 1080 contained the old and new loan numbers for Loan 56 and the street address associated with Loan 56 (Plaintiff claims on his copy the last digit of the new

1   loan number had the numeral 6 imposed on top of the number 5) (Doc. #66 at 8).

2   Defendant's copy of check 1080 contained the old and new loan numbers for Loan 56 and the

3   street address associated with Loan 56; but, the new loan number for Loan 56 had been

4   scratched out and the new loan number for Loan 55 was written on the check (*Id.*). On or

5   about April 17, 2005, Plaintiff sent an urgent letter via facsimile and FedEx regarding its

6   continued failure to correct its error and the inaccurate reporting to the CRAs (*Id.* at 8-9).

7   Plaintiff obtained counsel on or about April 27, 2005 and Defendant commenced foreclosure

8   proceedings on Loan 56 on or about May 4, 2005 (*Id.* at 9).

9       Construing the pleadings and evidence in the light most favorable to Plaintiff, it

10  appears Defendant acknowledged it had misapplied Plaintiff's loan payment to another

11  account (albeit another of Plaintiff's accounts) and then willfully refused to correct its own

12  error. Apparently, that error is what caused Loan 56 to go into default. Thus, assuming

13  Defendant had applied the payment to the correct account (Loan 55), Loan 56 would not have

14  gone into default and Defendant would not have reported the default to the CRAs. Then,

15  after being notified by the CRAs that Plaintiff disputed the information it was reporting

16  regarding Loan 56, and after acknowledging its own error in misapplying Plaintiff's check,

17  Defendant, nevertheless, willfully and intentionally refused to reverse the check and credit

18  it to the proper account (Loan 56). Instead, Defendant informed Plaintiff it would not reverse

19  its own error because Loan 55 was delinquent.

20      Acknowledging its own error and refusing to correct it, while still reporting negative

21  information to the CRAs, certainly qualifies as willfulness under the FCRA. Defendant was

22  notified by the CRAs that the information was in dispute and Plaintiff notified Defendant on

23  numerous occasions that it had misapplied a payment, which was causing serious damage to

24  Plaintiff. Construing the evidence most favorable to Plaintiff, Defendant had an obligation

25  to reinvestigate the disputed information, which it apparently did; but then it openly refused

26  to correct its own error. Then, on or about February 3, 2005, after the expiration of the 30-

27  day reinvestigation period expired, Defendant's Default Administration Division informed

28

38

Plaintiff that it was contacting the various CRAs and instructing them to correct the previously reported inaccurate information regarding Loan 56, yet, apparently this was never done.  Under these facts, Plaintiff has sufficiently pled a willful violation of the FCRA; therefore, summary judgment on Plaintiff's punitive damages claim is **<u>DENIED</u>**.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

39

# IV.  CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. #105) is **GRANTED in part and DENIED in part** as follows:

1.    Dove Street Capital Lenders (the "Dove Street Loan") - **GRANTED**

2.    Loans from family and friends to pay the Dove Street Loan monthly payments - **GRANTED**

3.    Southern Oregon Investment Group (SOIG) - **GRANTED**

4.    Late fees and costs on rental properties - **GRANTED**

5.    James Lane Property - **DENIED**

6.    Anticipated profits on Cashill subdivision - **GRANTED**

7.    Detrick Loan - **GRANTED**

8.    Erna Way - **DENIED**

9.    Sale of 21 properties - **GRANTED**

10.    Lost business opportunities on fifty (50) transactions - **GRANTED**

11.    Sky T Stock - **DENIED**

12.    Interest on son's student loans - **GRANTED**

13.    Credit cards - **DENIED**

14.    Credit lines - **DENIED**

15.    Damages predating Defendant's failure to reinvestigate - **GRANTED**

16.    Punitive damages - **DENIED**

DATED:   May 14, 2008.

_____
UNITED STATES MAGISTRATE JUDGE